# EXHIBIT A

| CIVIL ACTION COVER SHEET | DOCKET NO(S). 04-1708 | Trial Court of Massachusetts Superior Court Department County: MIDDLESEX |
|---|---|---|

| PLAINTIFF(S) John B. Willette, et al. | DEFENDANT(S) Indevus Pharmaceuticals, Inc., f/k/a Interneuron Pharmaceuticals Inc., et als. |
|---|---|

| ATTORNEY, FIRM, ADDRESS AND TELEPHONE (617) 720-1333<br>David C. Strouss, Esq. (BBO#546253), Marilyn T. McGoldrick, Esq. (BBO#561766), THORNTON & NAUMES, LLP,<br>100 Summer St., 30th fl., Boston, MA 02110,<br>Baron & Budd, 3102 Oak Lawn Avenue, Ste. 1100, Dallas, TX 75219<br>Board of Bar Overseers number: | ATTORNEY (if known) |
|---|---|

### Origin code and track designation

Place an x in one box only:

- ☒ 1. FO1 Original Complaint
- ☐ 2. FO2 Removal to Sup.Ct. C.231, s.104 (Before trial) (F)
- ☐ 3. FO3 Retransfer to Sup.Ct.C.231,s.102C(X)
- ☐ 4. F04 District Court Appeal c.231,s.97 & 104 (After trial) (X)
- ☐ 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P.60) (X)
- ☐ 6. E10 Summary Process Appeal (X)

### TYPE OF ACTION AND TRACK DESIGNATION (See Reverse Side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| B05 | Products Liability | ( A ) | ( x ) Yes  ( ) No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $..see attached..
2. Total Doctor expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $..see attached..
3. Total chiropractic expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $..see attached..
4. Total physical therapy expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $..see attached..
5. Total other expenses (describe) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $..see attached..

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
APR 21 2004
Edward J. Sullivan
CLERK

Subtotal $..see attached..

B. Documented lost wages and compensation to date . . . . . . . . . . . . . . . . . . . . . . . $..see attached..
C. Documented property damages to date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $..see attached..
D. Reasonably anticipated future medical and hospital expenses . . . . . . . . . . . . . . . . $..see attached..
E. Reasonably anticipated lost wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $..see attached..
F. Other documented items of damages (describe)

$..see attached..

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

Plaintiff suffers from an asbestos-related disease arising out of his
exposure to asbestos and asbestos-containing products mined, milled,
manufactured, fabricated, supplied and/or sold by defendants.

$..see attached..

TOTAL $..2,000,000.00.

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

TOTAL $................

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

Eastern Counties Massachusetts Asbestos Litigation Docket

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record_____    DATE: 4/21/04

, Esq.

# CIVIL ACTION COVER SHEET
## INSTRUCTIONS

### SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

**CONTRACT**

| | | |
|---|---|---|
| A01 | Services, labor and materials | (F) |
| A02 | Goods sold and delivered | (F) |
| A03 | Commercial Paper | (F) |
| A08 | Sale or lease of real estate | (F) |
| A12 | Construction Dispute | (A) |
| A99 | Other (Specify) | (F) |

**TORT**

| | | |
|---|---|---|
| B03 | Motor Vehicle negligence-personal injury/property damage | (F) |
| B04 | Other negligence-personal injury/property damage | (F) |
| B05 | Products Liability | (A) |
| B06 | Malpractice-medical | (A) |
| B07 | Malpractice-other(Specify) | (A) |
| B08 | Wrongful death,G.L.c.229,s2A | (A) |
| B15 | Defamation (Libel-Slander) | (A) |
| B19 | Asbestos | (A) |
| B20 | Personal Injury-Slip&Fall | (F) |
| B21 | Environmental | (A) |
| B22 | Employment Discrimination | (F) |
| B99 | Other (Specify) | (F) |

**REAL PROPERTY**

| | | |
|---|---|---|
| C01 | Land taking (eminent domain) | (F) |
| C02 | Zoning Appeal, G.L. c.40A | (F) |
| C03 | Dispute concerning title | (F) |
| C04 | Foreclosure of mortgage | (X) |
| C05 | Condominium lien and charges | (X) |
| C99 | Other (Specify) | (F) |

**EQUITABLE REMEDIES**

| | | |
|---|---|---|
| D01 | Specific performance of contract | (A) |
| D02 | Reach and Apply | (F) |
| D06 | Contribution or Indemnification | (F) |
| D07 | Imposition of Trust | (A) |
| D08 | Minority Stockholder's Suit | (A) |
| D10 | Accounting | (A) |
| D12 | Dissolution of Partnership | (F) |
| D13 | Declaratory Judgment G.L.c.231A | (A) |
| D99 | Other (Specify) | (F) |

**MISCELLANEOUS**

| | | |
|---|---|---|
| E02 | Appeal from administrative Agency G.L. c. 30A | (X) |
| E03 | Action against Commonwealth Municipality, G.L. c.258 | (A) |
| E05 | All Arbitration | (X) |
| E07 | c.112,s.12S (Mary Moe) | (X) |
| E08 | Appointment of Receiver | (X) |
| E09 | General contractor bond, G.L. c.149,s.29,29a | (A) |
| E11 | Workman's Compensation | (X) |
| E14 | Chapter 123A Petition-SDP | (X) |
| E15 | Abuse Petition, G.L.c.209A | (X) |
| E16 | Auto Surcharge Appeal | (X) |
| E17 | Civil Rights Act, G.L.c.12,s.11H | (A) |
| E18 | Foreign Discovery proceeding | (X) |
| E96 | Prisoner Cases | (F) |
| E97 | Prisoner Habeas Corpus | (X) |
| E99 | Other (Specify) | (X) |

### TRANSFER YOUR SELECTION TO THE FACE SHEET.

EXAMPLE:

| CODE NO. | TYPE OF ACTION (SPECIFY) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | (F) | [X] Yes ☐ No |

### SUPERIOR COURT RULE 29

**DUTY OF THE PLAINTIFF.** The plaintiff or his/her counsel shall set forth, on the face sheet (or attach additional sheets as necessary), a statement specifying in full and itemized detail the facts upon which the plaintiff then relies as constituting money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served on the defendant together with the complaint. If a statement of money damages, where appropriate is not filed, the Clerk-Magistrate shall transfer the action as provided in Rule 29(5)(C).

**DUTY OF THE DEFENDANT.** Should the defendant believe the statement of damages filed by the plaintiff in any respect inadequate, he or his counsel may file with the answer a statement specifying in reasonable detail the potential damages which may result should the plaintiff prevail. Such statement, if any, shall be served with the answer.

### A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT, BUFF COLOR PAPER.

### FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY MAY RESULT IN DISMISSAL OF THIS ACTION.

Plaintiffs' Attachment to Civil Action Cover Sheet:
Susan E. Willette, et al.
DOCKET NO. 00-

Plaintiffs, Susan E. Willette, et. al, suffer from valvular heart disease and/or primary pulmonary hypertension. Although they have each incurred substantial doctor, medical, hospital, clinic, therapy and rehabilitative expenses as a result of their treatment for their injuries, plaintiffs have no documentation of these expenses at this time. However, plaintiffs expect that expenses relating to their injuries exceeded $500,000. Plaintiffs have requested copies of medical bills which should enable them to more accurately document the medical expenses. Future medical expenses are expected to exceed $500,000.

As a result of the tortious conduct of the defendants, plaintiffs have been damaged to the extent that they will suffer a dramatic reduction in their life expectancy, experience great mental and physical pain and suffering and suffer an impairment in their enjoyment of life, and lost earning capacity. Plaintiffs estimate that these damages exceed $500,000.

As a result of their injuries, plaintiffs, Jeff Belles, Shirley Cohen, Robert E. King, Robert E. Laessing, Harley Duane McGovern, Kristina Roseberry, James R. Spector and Harriet Waller, have suffered and continue to suffer a corresponding loss of consortium with their spouse and have suffered and continue to suffer a loss of their spouse's services, society and affection. Plaintiffs estimate that these damages exceed $500,000.

Plaintiffs estimate that the total damages suffered by them will far exceed $2,000,000 in actual damages plus punitive damages.

Plaintiffs reserve the right to amend or supplement this statement.

COMMONWEALTH OF MASSACHUSETTS

EASTERN COUNTIES, SS.                                    SUPERIOR COURT
MIDDLESEX, SS.

| IN RE MASSACHUSETTS STATE COURT DIET DRUG LITIGATION | Civil Action No. |
| --- | --- |

**04-1708**

| **Susan E. Willette; Laura Belles and Jeff Belles; David M. Cohen and Shirley Cohen; Jan Courier; Ricardo Guzman; Debra A. King and Robert E. King; Maria M. Laessig and Robert E. Laessing; Helen Cruz Madla; Maryann McGovran and Harley Duane McGovran; H. Kenneth Roseberry, Jr. and Kristina Roseberry; Jerry E. Smith; Diana Lynn Spector and James R. Spector, II; Yvonne K. Stankey; Ronald A. Waller and Harriet Waller; Susan R. Weiszbrod; Connie L. Weygandt; and Beverly McDuffie Whitaker,** |
| **Plaintiffs.** |
| **v.** |
| **Indevus Pharmaceuticals, Inc., F/K/A Interneuron Pharmaceuticals, Inc.; Wyeth, Inc., F/K/A American Home Products Corporation; Wyeth Pharmaceuticals, Inc F/K/A Wyeth-Ayerst Pharmaceuticals, Inc., A Division Of American Home Products Corporation; and Boehringer Ingelheim Pharmaceuticals, Inc.; and James A. Edmondson; Linda L. Gonzales (a/k/a Linda L. McElroy); Arturo I. Gonzalez; Andrew D. Morton; Patricia M. Ulrich; Christine K. Wagner; Mark A. Conrad; Mae O. Hence; Dennis L. Westfall; Elutherio Farias; Virginia F. Riley; Jennifer J. Froelich; Michael Topalian; Donna M. Williams; Lisa Elek; Joseph Potter, III; Karen L. Symon; Don LeCocke; Richard E. Martinez; Alberto Rodriguez, I; Debbie K. Anderes; Michael B. Barks; David P. Cauwels; Thomas Meehan; David R. Mrosko; Patricia M. Tessendore; Michael T. Matanguihan; Charles J. Reinert; Kimberle Karen Maddox; Marjorie T. Rylee; Daniel B. Burke; Dean L. Marusak; A. Durwood Neie; Joseph Boswell; James V. Nash; Lisa Sabbagh; Gina M. Sanders; Gregory Garner; Jennifer L. Koelz; Rodney D. Miller; David E. Anderson; Mark D. Cook; Bruce R. Stewart; Paul D. Bowers; Dwane Lyle Hanson; Shanna Midland; David J. Schade; Anthony J. Cain; and John Doe,** |
| **Defendants.** |



**COMPLAINT**

```
04/21/04 16:03#0000 6249 CLERK E
              25@      240.00
         CIVIL       6000.00
         SURCHARGE     15.00
         SECC          20.00
         041708 #
         SUBTTL       6035.00
         TOTAL
              6035.00
         CHECK        6035.00
```

Plaintiffs, as named herein (collectively referred to as "Plaintiffs"), by and through their undersigned counsel, sue Defendants, Indevus Pharmaceuticals, Inc., f/k/a Interneuron Pharmaceuticals, Inc.; Wyeth, Inc. f/k/a American Home Products Corporation; Wyeth Pharmaceuticals, Inc. f/k/a WyethAyerst Phamaceuticals, Inc., a Division of American Home Products Corporation; and Boehringer Ingelheim Pharmaceuticals, Inc.; James A. Edmondson; Linda L. Gonzales (a/k/a Linda L. McElroy); Arturo I. Gonzalez; Andrew D. Morton; Patricia M. Ulrich; Christine K. Wagner; Mark A. Conrad; Mae O. Hence; Dennis L. Westfall; Elutherio Farias; Virginia F. Riley; Phillip Crawford; Jennifer J. Froelich; Michael Topalian; Donna M. Williams; Lisa Elek; Joseph Potter, III; Karen L. Symon; Don LeCocke; Richard E. Martinez; Alberto Rodriguez, I; Debbie K. Anderes; Michael B. Barks; David P. Cauwels; Thomas Meehan; David R. Mrosko; Patricia M. Tessendore; Michael T. Matanguihan; Charles J. Reinert; Kimberle Karen Maddox; Marjorie T. Rylee; Daniel B. Burke; Dean L. Marusak; A. Durwood Neie; Joseph Boswell; James V. Nash; Lisa Sabbagh; Gina M. Sanders; Gregory Garner; Jennifer L. Koelz; Rodney D. Miller; David E. Anderson; Mark D. Cook; Bruce R. Stewart; Paul D. Bowers; Dwane Lyle Hanson; Shanna Midland; David J. Schade; and Anthony J. Cain, and upon information and belief, allege as follows:

### Plaintiffs' Allegations

1.  Plaintiffs file this action against the named Defendants for injuries, including but not limited to valvular heart disease ("VHD"), secondary pulmonary hypertension, and other associated injuries suffered by Plaintiffs as a result of their ingestion of the defective and dangerous pharmaceutical diet drugs Redux™ and Pondimin® ("Diet Drugs") which were researched, created, formulated, tested, developed, designed, licensed, assembled, compounded,

2

manufactured, marketed, promoted, advertised, distributed, labeled, detailed, supplied, packaged and/or sold by Defendants, Indevus Pharmaceuticals, Inc. f/k/a Interneuron Pharmaceuticals, Inc. ("Interneuron" or "Defendant"); Wyeth, Inc. f/k/a American Home Products Corporation ("Wyeth Defendant" or "Defendant"); Wyeth Pharmaceuticals, Inc. f/k/a Wyeth-Ayerst Phamaceuticals, Inc. ("Wyeth Defendant" or "Defendant"); Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer" or "Defendants"); James A. Edmondson; Linda L. Gonzales (a/k/a Linda L. McElroy); Arturo I. Gonzalez; Andrew D. Morton; Patricia M. Ulrich; Christine K. Wagner; Mark A. Conrad; Mae O. Hence; Dennis L. Westfall; Elutherio Farias; Virginia F. Riley; Jennifer J. Froelich; Michael Topalian; Donna M. Williams; Lisa Elek; Joseph Potter, III; Karen L. Symon; Don LeCocke; Richard E. Martinez; Alberto Rodriguez, I; Debbie K. Anderes; Michael B. Barks; David P. Cauwels; Thomas Meehan; David R. Mrosko; Patricia M. Tessendore; Michael T. Matanguihan; Charles J. Reinert; Kimberle Karen Maddox; Marjorie T. Rylee; Daniel B. Burke; Dean L. Marusak; A. Durwood Neie; Joseph Boswell; James V. Nash; Lisa Sabbagh; Gina M. Sanders; Gregory Garner; Jennifer L. Koelz; Rodney D. Miller; David E. Anderson; Mark D. Cook; Bruce R. Stewart; Paul D. Bowers; Dwane Lyle Hanson; Shanna Midland; David J. Schade; Anthony J. Cain; and John Doe, as more fully detailed herein below.

2.    This action is brought on behalf of the following Plaintiffs each of whom is suffering from VHD as a result of the ingestion, consumption and use of the Diet Drugs and each of whom is at risk of developing or is already suffering from secondary pulmonary hypertension and other related conditions as a direct and proximate result of said ingestion, consumption and use:

3

      a.      Plaintiff Susan E. Willette is a citizen and resident of Bagley, MN who is suffering from VHD as a result of the ingestion of the Diet Drugs;

      b.      Plaintiff Laura Belles is a citizen and resident of El Paso, TX who is suffering from VHD as a result of the ingestion of the Diet Drugs;

      c.      Plaintiff David M. Cohen is a citizen and resident of Las Vegas, NV who is suffering from VHD as a result of the ingestion of the Diet Drugs;

      d.      Plaintiff Jan Courier is a citizen and resident of Raytown, MO who is suffering from VHD as a result of the ingestion of the Diet Drugs;

      e.      Plaintiff Ricardo Guzman is a citizen and resident of Kingsville, TX who is suffering from VHD as a result of the ingestion of the Diet Drugs;

      f.      Plaintiff Debra A. King is a citizen and resident of Lansing, IL who is suffering from VHD as a result of the ingestion of the Diet Drugs;

      g.      Plaintiff Maria M. Laessig is a citizen and resident of Oaklyn, NJ who is suffering from VHD as a result of the ingestion of the Diet Drugs;

      h.      Plaintiff Helen Cruz Madla is a citizen and resident of Austin, TX who is suffering from VHD as a result of the ingestion of the Diet Drugs;

      i.      Plaintiff Maryann McGovran is a citizen and resident of North Fork, CA who is suffering from VHD as a result of the ingestion of the Diet Drugs;

      j.      Plaintiff H. Kenneth Roseberry, Jr. is a citizen and resident of Butler, KY who is suffering from VHD as a result of the ingestion of the Diet Drugs;

      k.      Plaintiff Jerry E. Smith is a citizen and resident of Coppell, TX who is suffering from VHD as a result of the ingestion of the Diet Drugs;

      l.      Plaintiff Diana Lynn Spector is a citizen and resident of Sunray, TX who is suffering from VHD as a result of the ingestion of the Diet Drugs;

4

m.      Plaintiff Yvonne K. Stankey is a citizen and resident of Ventura, CA who is suffering from VHD as a result of the ingestion of the Diet Drugs;

n.      Plaintiff Ronald A. Waller is a citizen and resident of Vernon Hills, IL who is suffering from VHD as a result of the ingestion of the Diet Drugs;

o.      Plaintiff Susan R. Weiszbrod is a citizen and resident of Altus, OK who is suffering from VHD as a result of the ingestion of the Diet Drugs;

p.      Plaintiff Connie L. Weygandt is a citizen and resident of Hebo, OR who is suffering from VHD as a result of the ingestion of the Diet Drugs;

q.      Plaintiff Beverly McDuffie Whitaker is a citizen and resident of Colquitt, GA who is suffering from VHD as a result of the ingestion of the Diet Drugs;

3.      Each and every Plaintiff was prescribed and did ingest dexfenfluramine, sold under the brand name Redux™.  As well, upon information and belief, some of the Plaintiffs also ingested fenfluramine, sold under both the generic name fenfluramine and the brand name Pondimin®, comprised of dexfenfluramine as its sole active ingredient.

4.      Plaintiffs meet all medical criteria to qualify as intermediate and/or back-end opt-outs to the National Settlement.  Specifically, Plaintiffs' echocardiograms, all of which were read and interpreted by board-certified cardiologists, demonstrate that they meet the definition of FDA positive heart valve regurgitation as defined by the National Settlement.  Plaintiffs have properly exercised intermediate and/or back-end opt-out rights by completing, signing and timely submitting an opt-out form to the Settlement Court, the Trustees, and/or the Claims Administrator(s) and to the Wyeth Defendants.  By filing this Complaint, Plaintiffs assert only those claims and is seeking only those damages as are permitted under the National Settlement.

5

No other language in this Complaint shall be interpreted as Plaintiffs' intent to do otherwise.  All aspects of this action are consistent with Plaintiffs' rights as an intermediate and/or back-end opt-out from the National Class Action Settlement.

5.       Each and every Plaintiff named herein has filed this lawsuit within any applicable statute of limitations period.

6.       Each and every Plaintiff named herein acted with diligence in attempting to discover any injury caused by their ingestion of the Diet Drugs, including following the advise of their physicians, monitoring their symptoms, and following the recommendations of the American Medical Association, American College of Cardiology, American Heart Association, American Society of Echocardiography, United States Department of Health and Human Services, and the National Diet Drug Settlement.  Such Plaintiffs did not and could not have discovered their injury until they had an echocardiogram demonstrating the presence of FDA positive valvular heart disease, and could not have brought a cause of action against any of the named Defendants, including Defendant Interneuron until such Plaintiffs discovered that any injury detected was a result of the action and/or omissions of the named Defendants, including Defendant Interneuron.

7.       Any statute of limitations period which applies to the Plaintiffs' claims against Defendant Interneuron, have been tolled under the principles of class action tolling as recognized by the Appeals Court of Massachusetts in *DiCerbo v. Commissioner Of The Department Of Employment And Training*, 54 Mass.App.Ct. 128,  763 N.E.2d 566  (Mass.App.Ct. 2003), citing *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) and *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353-354, 103 S.Ct. 2392, 76 L.Ed.2d 628

6

(1983), as multiple class actions against Interneuron have been filed in state and federal courts

across the country, bringing claims which are substantially the same as those claims brought in

this lawsuit, including the class action complaint, *Doherty et al, v. Interneuron, et al, No.* 98-

0028-C, filed in Massachusetts state court in 1998 and which remained pending through the

summer of 2001. Any effort by Defendant Wyeth to remove this case based on the principle of

the fraudulent joinder of Defendant Interneuron is, therefore, an improvident removal, done

solely to deprive Plaintiffs of their right to bring their claims in the forum of their choice.

### Introduction

8.      The Diet Drugs which Plaintiffs were prescribed and ingested, and which caused

Plaintiffs to suffer valvular heart disease and associated injuries, were defective and

unreasonably dangerous in that the Diet Drugs: were not reasonably safe for their intended use as

a weight loss drugs; subjected Plaintiffs to risks which exceeded the benefits of the Diet Drugs, if

any; were defective in design and formulation, making use of the drug more dangerous than an

ordinary consumer would expect; were more dangerous than other risks associated with obesity

and/or weight loss; and were otherwise defective and unreasonably dangerous as set forth herein.

9.      The defective and unreasonably dangerous Diet Drugs caused Plaintiffs to suffer

from valvular heart disease and resultant injuries and damages. Valvular heart disease ("VHD")

is a serious and potentially fatal disease marked by the improper backward flow or

"regurgitation" of blood within in the heart's chambers and blood vessels caused by the failure of

the heart's valves, which separate the heart's chambers, from properly closing. When the heart's

valves fail to close sufficiently, a common result of Diet Drug ingestion, this causes the

regurgitation of blood back into the chamber from which it has been pumped altering the

7

hemodynamics within the heart. Such regurgitation is a progressive condition causing the heart to work harder to supply the body with adequate blood and oxygen. As the heart muscle is forced to over-work, physiological and morphological changes occur whereby the heart muscle becomes enlarged and distorted in shape. As a consequence, conditions and injuries suffered as a result of these and similar Diet Drug induced changes in the heart include but are not limited to: congestive heart failure, pulmonary hypertension, valve replacement surgery, and/or death.

10.    Before the Plaintiffs were prescribed and ingested the Diet Drugs which caused them to suffer VHD and associated injuries, Defendants knew or should have known that the Diet Drugs had been related to and associated with these serious and life threatening side effects. The Defendants had an obligation under the law to disclose the association between their products and VHD.

11.    Due to Defendants' failure to adequately warn the FDA and doctors prescribing the Diet Drugs of the known risks of VHD, Plaintiffs' physicians were unable to inform Plaintiffs of the true risks associated with the ingestion of the Diet Drugs including VHD. These side effects were known or should have been known to Defendants at the time that they marketed the drugs to the public based on, among other things, adverse event reports, clinical studies and the medical evidence of dangerous and potentially fatal side effects from the use of the drugs in Europe and elsewhere. Defendants did not, however, conduct adequate testing to establish the safety of the drugs before marketing them nor did Defendants perform adequate post-marketing surveillance and monitoring which would have otherwise prevented Plaintiffs' injuries. Rather, the Defendants through their marketing and promotional campaigns downplayed and/or obfuscated evidence of the serious and potentially fatal side effects that consumers of these drugs

8

could face.

## Defendants

12.    The Defendant, Indevus Pharmaceuticals, Inc., f/k/a Interneuron Pharmaceuticals,

Inc. ("Interneuron") has its principal place of business at the Ledgemont Center, 99 Hayden

Avenue, Lexington, Massachusetts and is incorporated in the State of Delaware.  At all times

relevant hereto, Interneuron was engaged in the business of researching, formulating, testing,

developing, designing, licensing, assembling, compounding, marketing, promoting, distributing,

detailing, and/or selling the pharmaceutical diet drug Redux.  At all times relevant hereto,

Interneuron researched, formulated, tested, developed, designed, licensed, assembled,

compounded, marketed, promoted, distributed, detailed, and/or sold Redux through interstate

commerce through the use of its employees and/or agents including Interneuron's field sales

representative force or detailers who made direct contact with physicians including Plaintiffs'

prescribing doctors.  Beginning in or about 1989, Interneuron researched, created, formulated,

tested, developed, designed, and/or licensed Redux.  On or about November 19, 1992,

Interneuron entered into a joint venture or partnership with American Cyanamid Company

("American Cyanamid" or "Wyeth Defendants"), a predecessor company to the Wyeth

Defendants, and Les Laboratories Servier ("Servier") pursuant to the terms of a "Patent and

Know-How Sublicense Supply Agreement" for the manufacturing, marketing, labeling,

promotion and sale of Redux.  On or about November 21, 1995, Defendant, Interneuron, entered

into an exclusive "Contract Manufacturing Agreement" with Defendant, Boehringer, by which

Boehringer agreed to manufacture, develop, test, assemble, package, label, prepare and/or supply

Redux exclusively for and/or to Defendant, Interneuron, including supplying Defendant,

9

Interneuron, with all of its requirements of Redux for ultimate sale in the United States including

the State of Massachusetts. On or about June 1, 1996, Interneuron entered into a "Co-promotion

Agreement" with the Wyeth Defendants which both reaffirmed the pre-existing joint venture or

partnership between Interneuron and the Wyeth Defendants and provided for Interneuron to

market, promote, advertise, distribute, label, detail, supply, package and/or sell Redux in

consideration for the payments from Interneuron's co-promoter, Wyeth Defendants, for

percentages of profit derived from sales generated by Interneuron's sales representative sales

force. At all times material hereto, Interneuron does and did business in the State of

Massachusetts and researched, created, formulated, tested, developed, designed, licensed,

assembled, compounded, manufactured, marketed, promoted, advertised, distributed, labeled,

detailed, supplied, packaged and/or sold the pharmaceutical known as Redux in interstate

commerce and in the various States within which Plaintiffs were prescribed and ingested the Diet

Drugs.

13.     The Defendant, Wyeth, Inc., f/k/a American Home Products Corporation, is a

Delaware corporation with its principal place of business at 5 Giralda Farms, Madison, New

Jersey. At all times material hereto, this Defendant manufactured, supplied, packaged, labeled,

detailed promoted, advertised, marketed, distributed and/or sold the pharmaceuticals known as

Pondimin and Redux. A.H. Robins Company, Incorporated ("A.H. Robins") was a corporation,

organized and existing under the laws of the State of Delaware, which manufactured, supplied,

packaged, labeled, detailed promoted, advertised, marketed, distributed and/or sold Pondimin for

many years between 1973 and 1990. A.H. Robins had its principal place of business in the State

of Virginia until at least 1990, when it was acquired by American Home Products Corporation,

10

now known as Wyeth, which company has assumed all responsibility for any liability of A.H.

Robins arising from its manufacturing, supplying, packaging, labeling, detailing, promoting,

advertising, marketing, distributing and/or sale of Pondimin.  On or about November 19, 1992,

Wyeth, Inc., through another predecessor company, American Cyanamid, whose assets and

liabilities it later acquired, entered into a joint venture or partnership with Interneuron

Pharmaceuticals, Inc. and Servier pursuant to the terms of a "Patent and Know-How Sublicense

Supply Agreement" for the manufacturing, supplying, packaging, labeling, detailing, promoting,

advertising, marketing, distributing and/or sale of Redux and at all times material was engaged in

a joint venture or partnership with Interneuron Pharmaceuticals, Inc., Servier, and Boehringer

Ingelheim, Inc., in the manufacturing, supplying, packaging, labeling, detailing, promoting,

advertising, marketing, distributing and/or sale of Redux.  On or about June 1, 1996, this

Defendant entered into a "Co-promotion Agreement" with Interneuron Pharmaceuticals, Inc. that

reaffirmed the joint venture or partnership between this Defendant and Interneuron

Pharmaceuticals, Inc.  At all times material hereto, this Defendant does and did business in the

State of Massachusetts and researched, created, formulated, tested, developed, designed,

licensed, assembled, compounded, manufactured, marketed, promoted, advertised, distributed,

labeled, detailed, supplied, packaged and/or sold the pharmaceutical known as Pondimin and

Redux in interstate commerce and in the various States within which Plaintiffs were prescribed

and ingested the Diet Drugs.

     14.     The Defendant, Wyeth Pharmaceuticals, f/k/a Wyeth-Ayerst Laboratories, Inc., is

a Delaware Corporation with its principal place of business at 555 Lancaster Avenue, St. Davids,

Pennsylvania. At all times material hereto, this Defendant manufactured, supplied, packaged,

labeled, detailed promoted, advertised, marketed, distributed and/or sold the pharmaceuticals known as Pondimin and Redux. A.H. Robins was a corporation, organized and existing under the laws of the State of Delaware, which manufactured, supplied, packaged, labeled, detailed promoted, advertised, marketed, distributed and/or sold Pondimin for many years between 1973 and 1990. A.H. Robins had its principal place of business in the State of Virginia until at least 1990, when it was acquired by American Home Products Corporation, now known as Wyeth, which company has assumed all responsibility for any liability of A.H. Robins arising from its manufacturing, supplying, packaging, labeling, detailing, promoting, advertising, marketing, distributing and/or sale of Pondimin. On or about November 19, 1992, Wyeth, Inc., through another predecessor company, American Cyanamid, whose assets and liabilities it later acquired, entered into a joint venture or partnership with Interneuron Pharmaceuticals, Inc. and Servier pursuant to the terms of a "Patent and Know-How Sublicense Supply Agreement" for the manufacturing, supplying, packaging, labeling, detailing, promoting, advertising, marketing, distributing and/or sale of Redux and at all times material was engaged in a joint venture or partnership with Interneuron Pharmaceuticals, Inc., Servier, and Boehringer Ingelheim, Inc., in the manufacturing, supplying, packaging, labeling, detailing, promoting, advertising, marketing, distributing and/or sale of Redux. On or about June 1, 1996, this Defendant entered into a "Co-promotion Agreement" with Interneuron Pharmaceuticals, Inc. that reaffirmed the joint venture or partnership between this Defendant and Interneuron Pharmaceuticals, Inc. At all times material hereto, this Defendant does and did business in the State of Massachusetts and researched, created, formulated, tested, developed, designed, licensed, assembled, compounded, manufactured, marketed, promoted, advertised, distributed, labeled, detailed, supplied, packaged

12

and/or sold the pharmaceutical known as Pondimin and Redux in interstate commerce and in the various States within which Plaintiffs were prescribed and ingested the Diet Drugs.

15.    The Defendant, Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer"), is a Delaware Corporation with its principal place of business at 900 Ridgebury Road, Ridgefield, Connecticut 06877. At all times material hereto, this Defendant was in the business of manufacturing, assembling, developing and/or supplying the pharmaceutical known as Redux. On or about November 21, 1995, Defendant, Boehringer, entered into an exclusive "Contract Manufacturing Agreement" with Defendant, Interneuron, by which Boehringer agreed to manufacture, develop, test, assemble, package, label, prepare and/or supply Redux exclusively for and/or to Defendants, Interneuron and Wyeth Defendants, including supplying Defendants Interneuron and the Wyeth Defendants, with all of its requirements of Redux for sale in the United States. At all times material hereto, Boehringer does and did business in Massachusetts and manufactured, developed, tested, assembled, packaged, labeled, prepared and/or supplied Redux in interstate commerce and in the various States within which Plaintiffs were prescribed and ingested the Diet Drugs. Upon information and belief, the Redux ingested by Plaintiffs was manufactured, developed, tested, assembled, packaged, labeled, prepare and/or supplied by Boehringer. Though "Diet Drugs" as provided herein shall otherwise include both Redux and Pondimin, all allegations referencing "Diet Drugs" as set forth herein relating to Boehringer shall only relate to Redux.

16.    The sales representatives were responsible for detailing Interneuron, Boehringer, and Wyeth products to prescribing physicians. In detailing, these representatives presented drugs to physicians and explained efficacy, side effects, and any warnings related to the drug. These

13

defendants knew or should have known at the time of drug approval, or through post-marketing surveillance, the risks of heart and lung disease associated with the use of Pondimin and Redux and that these drugs were ineffective and unproven for long-term weight control. These defendants also had first-hand knowledge that Pondimin and Redux were being widely used. These defendants had the responsibility to inform physicians about these risks. Nonetheless, these representatives failed and neglected to warn physicians or consumers of these dangers. These defendants are responsible for their own acts of negligence or otherwise tortious conduct with respect to the marketing of Interneuron, Boehringer, and Wyeth products.

17.    The Defendant, James A. Edmondson, an individual, is a citizen and resident of San Antonio, Texas and can be served at 12709 Castle Bend Street, San Antonio, Texas 78230. Defendant James A. Edmondson is sued as a sales representative solely as to the claims of Plaintiff Laura Belles.

18.    The Defendant, Linda L. Gonzales (a/k/a Linda L. McElroy), an individual, is a citizen and resident of El Paso, Texas and can be served at 10116 Deanza, El Paso, Texas 79905. Defendant Linda L. Gonzales (a/k/a Linda L. McElroy) is sued as a sales representative solely as to the claims of Plaintiff Laura Belles.

19.    The Defendant, Arturo I. Gonzalez, an individual, is a citizen and resident of El Paso, Texas and can be served at 6931 Rock Canyon Drive, El Paso, Texas 79912-7663. Defendant Arturo I. Gonzalez is sued as a sales representative solely as to the claims of Plaintiff Laura Belles.

20.    The Defendant, Andrew D. Morton, an individual, is a citizen and resident of El Paso, Texas and can be served at 6022 Caprock, #1506, El Paso, Texas 79912. Defendant

14

Andrew D. Morton is sued as a sales representative solely as to the claims of Plaintiff Laura Belles.

21.    The Defendant, Patricia M. Ulrich, an individual, is a citizen and resident of San Ramon, California and can be served at 2604 Shadow Mountain Drive, San Ramon, California 94583-1828. Defendant Patricia M. Ulrich is sued as a sales representative solely as to the claims of Plaintiff David M. Cohen.

22.    The Defendant, Christine K. Wagner, an individual, is a citizen and resident of Livermore, California and can be served at 4064 Emerson Drive, Livermore, California 95441-4808. Defendant Christine K. Wagner is sued as a sales representative solely as to the claims of Plaintiff David M. Cohen.

23.    The Defendant, Mark A. Conrad, an individual, is a citizen and resident of Lees Summit, Ohio and can be served at 309 SE Williamsburg Drive, Lees Summit, Ohio 64014. Defendant Mark A. Conrad is sued as a sales representative solely as to the claims of Plaintiff Jan Courier.

24.    The Defendant, Mae O. Hence, an individual, is a citizen and resident of Raytown, Missouri and can be served at 8400 Woodson Court, Raytown, Missouri 64138. Defendant Mae O. Hence is sued as a sales representative solely as to the claims of Plaintiff Jan Courier.

25.    The Defendant, Dennis L. Westfall, an individual, is a citizen and resident of Blue Springs, Missouri and can be served at 1120 NE Waterfield Valley Drive, Blue Springs, Missouri 64014. Defendant Dennis L. Westfall is sued as a sales representative solely as to the claims of Plaintiff Jan Courier.

26.     The Defendant, Elutherio Farias, an individual, is a citizen and resident of Corpus Christi, Texas and can be served at 3321 Springhill, Corpus Christi, Texas 78410. Defendant Elutherio Farias is sued as a sales representative solely as to the claims of Plaintiff Ricardo Guzman.

27.     The Defendant, Virginia F. Riley, an individual, is a citizen and resident of Corpus Christi, Texas and can be served at 1438 Ormond, Corpus Christi, Texas 78415. Defendant Virginia F. Riley is sued as a sales representative solely as to the claims of Plaintiff Ricardo Guzman.

28.     The Defendant, John Doe, an individual, is sued as a sales representative solely as to the claims of Plaintiff Debra A. King.

29.     The Defendant, Jennifer J. Froelich. an individual, is a citizen and resident of Chicago, Illinois and can be served at 1909 N. Orchard St., Chicago, Illinois 60614. Defendant Jennifer J. Froelich is sued as a sales representative solely as to the claims of Plaintiff Debra A. King.

30.     The Defendant, Michael Topalian, an individual, is a citizen and resident of Covington, Kentucky and can be served at 102 Winding Way, Covington, Kentucky 41011. Defendant Michael Topalian is sued as a sales representative solely as to the claims of Plaintiff Debra A. King.

31.     The Defendant, Donna M. Williams, an individual, is a citizen and resident of Richton Park, Illinois and can be served at 700 Cedar Ridge Lane, Unit #106, Richton Park, Illinois 60471. Defendant Donna M. Williams is sued as a sales representative solely as to the claims of Plaintiff Debra A. King.

32.    The Defendant, Lisa Elek, an individual, is a citizen and resident of Springfield, Virginia and can be served at 7923 Richfield Road, Springfield, Virginia 22153. Defendant Lisa Elek is sued as a sales representative solely as to the claims of Plaintiff Maria M. Laessig.

33.    The Defendant, Joseph Potter, III, an individual, is a citizen and resident of Richmond, Virginia and can be served at 12156 Glen Gary Circle, Richmond, Virginia 23233. Defendant Joseph Potter, III is sued as a sales representative solely as to the claims of Plaintiff Maria M. Laessig.

34.    The Defendant, Karen L. Symon, an individual, is a citizen and resident of Germantown, Maryland and can be served at 12914 McCubbin Lane, Germantown, Maryland 20874. Defendant Karen L. Symon is sued as a sales representative solely as to the claims of Plaintiff Maria M. Laessig.

35.    The Defendant, Don LeCocke, an individual, is a citizen and resident of San Antonio, Texas and can be served at 1806 Shoal Run, San Antonio, Texas 78232. Defendant Don LeCocke is sued as a sales representative solely as to the claims of Plaintiff Helen Cruz Madla.

36.    The Defendant, Richard E. Martinez, an individual, is a citizen and resident of New Braunfels, Texas and can be served at 173 Greta Road, New Braunfels, Texas 78130. Defendant Richard E. Martinez is sued as a sales representative solely as to the claims of Plaintiff Helen Cruz Madla.

37.    The Defendant, Alberto Rodriguez, I, an individual, is a citizen and resident of San Antonio, Texas and can be served at 164 Oakwell Farms Parkway, San Antonio, Texas 78218. Defendant Alberto Rodriguez, I, is sued as a sales representative solely as to the claims

17

of Plaintiff Helen Cruz Madla.

38.    The Defendant, Debbie K. Anderes, an individual, is a citizen and resident of Fresno, California and can be served at 3414 W. Spruce Avenue, Fresno, California 93711. Defendant Debbie K. Anderes is sued as a sales representative solely as to the claims of Plaintiff Maryann McGovran.


39.    The Defendant, Michael B. Barks, an individual, is a citizen and resident of Fresno, California and can be served at 7095 N. Fruit Avenue, Suite 170, Fresno, California 93711. Defendant Michael B. Barks is sued as a sales representative solely as to the claims of Plaintiff Maryann McGovran.

40.    The Defendant, David P. Cauwels, an individual, is a citizen and resident of Fresno, California and can be served at 2393 E. El Paso Avenue, Fresno, California 93720. Defendant David P. Cauwels is sued as a sales representative solely as to the claims of Plaintiff Maryann McGovran.

41.    The Defendant, Thomas Meehan, an individual, is a citizen and resident of Freno, California and can be served at 838 E. Goshen, Fresno, California 93720. Defendant Thomas Meehan is sued as a sales representative solely as to the claims of Plaintiff Maryann McGovran.

42.    The Defendant, David R. Mrosko, an individual, is a citizen and resident of Bakersfield, California and can be served at 6405 Spring Valley Drive, Bakersfield, California 93308-6512. Defendant David R. Mrosko is sued as a sales representative solely as to the claims of Plaintiff Maryann McGovran.

43.    The Defendant, Patricia M. Tessendore, an individual, is a citizen and resident of

18

Fresno, California and can be served at 807 E. Mockingbird Lane, Fresno, California 93720. Defendant Patricia M. Tessendore is sued as a sales representative solely as to the claims of Plaintiff Maryann McGovran.

44.    The Defendant, Michael T. Matanguihan, an individual, is a citizen and resident of Independence, Kentucky and can be served at 4930 Open Meadow Drive, Independence, Kentucky 41051. Defendant Michael T. Matanguihan is sued as a sales representative solely as to the claims of Plaintiff H. Kenneth Roseberry, Jr.

45.    The Defendant, Charles J. Reinert, an individual, is a citizen and resident of Florence, Kentucky and can be served at 10171 Tiburon, Florence, Kentucky 41042. Defendant Charles J. Reinert is sued as a sales representative solely as to the claims of Plaintiff H. Kenneth Roseberry, Jr.

46.    The Defendant, Kimberle Karen Maddox, an individual, is a citizen and resident of Fort Worth, Texas and can be served at 2011 Pembroke Drive, Fort Worth, Texas 76110. Defendant Kimberle Karen Maddox is sued as a sales representative solely as to the claims of Plaintiff Jerry E. Smith.

47.    The Defendant, Marjorie T. Rylee, an individual, is a citizen and resident of Grapevine, Texas and can be served at 4304 Hazy Meadow Lane, Grapevine, Texas 76051. Defendant Marjorie T. Rylee is sued as a sales representative solely as to the claims of Plaintiff Jerry E. Smith.

48.    The Defendant, Daniel B. Burke, an individual, is a citizen and resident of Amarillo, Texas and can be served at 2200 S. Milan, Amarillo, Texas 79109. Defendant Daniel B. Burke is sued as a sales representative solely as to the claims of Plaintiff Diana Lynn Spector.

49.    The Defendant, Dean L. Marusak, an individual, is a citizen and resident of Amarillo, Texas and can be served at 6211 Dreyfuss, Amarillo, Texas 79106. Defendant Dean L. Marusak is sued as a sales representative solely as to the claims of Plaintiff Diana Lynn Spector.

50.    The Defendant, A. Durwood Neie, an individual, is a citizen and resident of Amarillo, Texas and can be served at 6706 Gainsborough Road, Amarillo, Texas 79106. Defendant A. Durwood Neie is sued as a sales representative solely as to the claims of Plaintiff Diana Lynn Spector.

51.    The Defendant, Joseph Boswell, an individual, is a citizen and resident of Glendale, California and can be served at 268 W. Dryden Street, Suite 111, Glendale, California 91202. Defendant Joseph Boswell is sued as a sales representative solely as to the claims of Plaintiff Yvonne K. Stankey.

52.    The Defendant, James V. Nash, an individual, is a citizen and resident of Santa Barbara, California and can be served at 434 Nicholas Lane, Santa Barbara, California 93108. Defendant James V. Nash is sued as a sales representative solely as to the claims of Plaintiff Yvonne K. Stankey.

53.    The Defendant, Lisa Sabbagh, an individual, is a citizen and resident of Agoura Hills, California and can be served at 30336 Goodsprings Drive, Agoura Hills, California 91301. Defendant Lisa Sabbagh is sued as a sales representative solely as to the claims of Plaintiff Yvonne K. Stankey.

54.    The Defendant, Gina M. Sanders, an individual, is a citizen and resident of Agoura Hills, California and can be served at 653 Oak Run Trail, Apartment 309, Agoura Hills,

20

California 91301. Defendant Gina M. Sanders is sued as a sales representative solely as to the claims of Plaintiff Yvonne K. Stankey.

55.    The Defendant, Gregory Garner, an individual, is a citizen and resident of Chicago, Illinois and can be served at 1444 W. Fargo, Suite 2W, Chicago, Illinois 60626. Defendant Gregory Garner is sued as a sales representative solely as to the claims of Plaintiff Ronald A. Waller.

56.    The Defendant, Jennifer L. Koelz, an individual, is a citizen and resident of Chicago, Illinois and can be served at 540 N. Lake Shore Drive, #203, Chicago, Illinois 60611. Defendant Jennifer L. Koelz is sued as a sales representative solely as to the claims of Plaintiff Ronald A. Waller.

57.    The Defendant, Rodney D. Miller, an individual, is a citizen and resident of Chicago, Illinois and can be served at 3639 N. Sheffield, Chicago, Illinois 60613. Defendant Rodney D. Miller is sued as a sales representative solely as to the claims of Plaintiff Ronald A. Waller.

58.    The Defendant, David E. Anderson, an individual, is a citizen and resident of Iowa Park, Texas and can be served at 3369 Horseshoe Bend, Iowa Park, Texas 76367. Defendant David E. Anderson is sued as a sales representative solely as to the claims of Plaintiff Susan R. Weiszbrod.

59.    The Defendant, Mark D. Cook, an individual, is a citizen and resident of Wichita Falls, Texas and can be served at 2709 Darwin Drive, Wichita Falls, Texas 76308. Defendant Mark D. Cook is sued as a sales representative solely as to the claims of Plaintiff Susan R. Weiszbrod.

60.    The Defendant, Bruce R. Stewart, an individual, is a citizen and resident of Wichita Falls, Texas and can be served at 1542 Wrangler Retreat, Wichita Falls, Texas 76308. Defendant Bruce R. Stewart is sued as a sales representative solely as to the claims of Plaintiff Susan R. Weiszbrod.

61.    The Defendant, Paul D. Bowers, an individual, is a citizen and resident of Tigard, Oregon and can be served at 15889 S.W. Kreick Place, Tigard, Oregon 97224. Defendant Paul D. Bowers is sued as a sales representative solely as to the claims of Plaintiff Connie L. Weygandt.

62.    The Defendant, Dwane Lyle Hanson, an individual, is a citizen and resident of Portland, Oregon and can be served at 2353 NW Origami Court, Portland, Oregon 97229. Defendant Dwane Lyle Hanson is sued as a sales representative solely as to the claims of Plaintiff Connie L. Weygandt.

63.    The Defendant, Shanna Midland, an individual, is a citizen and resident of Portland, Oregon and can be served at 15507 N.W. Andalusian Way, Portland, Oregon 97229. Defendant Shanna Midland is sued as a sales representative solely as to the claims of Plaintiff Connie L. Weygandt.

64.    The Defendant, David J. Schade, an individual, is a citizen and resident of Oregon City, Oregon and can be served at 14401 S. Hawthorne Court, Oregon City, Oregon 97045. Defendant David J. Schade is sued as a sales representative solely as to the claims of Plaintiff Connie L. Weygandt.

65.    The Defendant, Anthony J. Cain, an individual, is a citizen and resident of Fargo, North Dakota and can be served at 3101 37th Avenue, S.W., Fargo, North Dakota 58104.

22

Defendant Anthony J. Cain is sued as a sales representative solely as to the claims of Plaintiff Susan E. Willette.

## Factual Background

66.     Aminorex, discovered in 1960 by United States pharmaceutical company, McNeil Laboratories, was a drug from the same family of drugs as fenfluramine and dexfenfluramine. Aminorex was touted as a wonder weight loss drug which, like fenfluramine and dexfenfluramine, worked by increasing brain serotonin while inhibiting reuptake of serotonin.

67.     Fenfluramine is made up of two "mirror image" halves or isomers: dexfenfluramine (right-handed isomer or d-isomer), the isomer which increases the release and prevents the reuptake of serotonin in the brain, thereby presumably reducing appetite, and levofenfluramine (left-handed isomer or l-isomer), which increases dopamine release but can cause the unwanted side-effect of drowsiness.

68.     In 1963, Science Union & Co., an affiliate of Servier, entered into a licensing agreement with Wyeth Defendants' predecessor, A.H. Robins, giving it the right to market, promote, distribute, detail, sell or otherwise profit from the sale of fenfluramine in the United States.

69.     In 1965, after securing authorization for the marketing of fenfluramine in Europe, Servier commenced the sale of products containing fenfluramine in Europe. This same year, Aminorex was introduced into the European market.

70.     However, by 1967, evidence began to surface that the ingestion of Aminorex was associated with pulmonary hypertension. Over the next five years, Aminorex caused in Europe a ten-fold increase in pulmonary hypertension cases, permanent injury to patients who suffered

23

significant oxygen deprivation, and numerous deaths. In light of the reports of Aminorex
induced pulmonary hypertension, McNeil Laboratories prudently suspended its research and
efforts to bring Aminorex to the United States market. By 1972, Aminorex was removed from
the European market.

71.     In or about 1970, during the European experience, Dr. Richard Wurtman, a faculty
member of the Massachusetts Institute of Technology (MIT) and the founder of Interneuron
secured a United States patent for use of fenfluramine as a diet drug. Like Aminorex,
Fenfluramine was touted as a wonder weight loss drug designed to effect weight loss by
increasing brain serotonin while inhibiting reuptake of serotonin. The patent and rights to market
fenfluramine as an obesity drug were thereafter sub-licensed by Dr. Wurtman and/or MIT to
Servier.

72.     Despite the European experience, in June of 1973, fenfluramine was introduced
into the United States market by A.H. Robins which sold fenfluramine under the brand name
Pondimin. However, after introduction into the United States market, sales of fenfluramine
languished both because of restrictions in prescribing under the Controlled Substance Act and
because the fenfluramine isomer levofenfluramine caused users to become lethargic and tired
when using Pondimin alone.

73.     In 1977, Finnish researchers found a causal link between fenfluramine/
dexfenfluramine and heart valve lesions. Based on a study of weight-loss drugs including
Aminorex and fenfluramine/dexfenfluramine and their effects on the release of serotonin, it was
discovered that not only was the concentration of free serotonin in the blood vessels of the lungs

24

caused by the weight-loss drug responsible for pulmonary hypertension, but also that the vessel wall-thickening mechanism which caused pulmonary hypertension was likely the identical mechanism which caused right-sided heart valve thickening and regurgitation in carcinoid patients.

74.    Recognizing the problems in selling fenfluramine caused by the levofenfluramine isomer which caused users to become lethargic and tired, in or about 1980, Servier discovered a commercially feasible way to chemically isolate and separate the active ingredient in fenfluramine, being the right-sided d-isomer (dexfenfluramine) from the undesirable left-sided isomer (levofenfluramine) and commissioned and/or contracted Dr. Wurtman and/or MIT to further research, formulate, test, develop, design, license, assemble, compound, manufacture, market, promote, advertise, distribute, label, detail, supply, package and/or sell Redux for the United States market. This same year, MIT and/or Dr. Wurtman, secured a United States patent for use of dexfenfluramine as an obesity drug and thereafter, as with fenfluramine a decade earlier, sub-licensed the patent back to Servier.

75.    On October 3, 1981, Dr. J.G. Douglas published *Pulmonary Hypertension and Fenfluramine* in the British Medical Journal. On January 25, 1986 an article entitled *Irreversible Pulmonary Hypertension after Treatment with Fenfluramine*, was published in the British Medical Journal. Defendants knew, or should have known, of the British Medical Journal articles and how those articles related to fenfluramine and dexfenfluramine, and their propensity to cause valvular heart disease, and secondary pulmonary hypertension.

76.    While the sales of Pondimin languished between 1973 and 1984, sales of Pondimin increased, however, after several studies or reports sponsored, subsidized, and/or

25

supported by the Wyeth Defendants' predecessor, A.H. Robins, were published within the medical community. Specifically, in 1984, Dr. Michael Weintraub published *A Double-Blind Clinical Trial in Weight Control: Use of Fenfluramine and Phentermine Alone and in Combination* in the Archives of Internal Medicine. Dr. Weintraub's study was sponsored, subsidized, and/or supported by A.H. Robins (later acquired by the Wyeth Defendants). Despite noting some adverse effects associated with fenfluramine, Dr. Weintraub failed to examine the long-term safety of fenfluramine. Instead, the study focused on the short-term effectiveness of the drugs used individually, and in combination with phentermine.

77.    In 1985, after securing authorization for the marketing of dexfenfluramine in Europe, Servier commenced the sale of products containing dexfenfluramine in Europe under the brand/trade names Adifax (in England) and Isomeride (in France).

78.    In or about 1989, after MIT and Dr. Wurtman had researched, formulated, tested, developed, designed, licensed, assembled and compounded dexfenfluramine for several years in preparation for submitting dexfenfluramine for FDA approval and licensing for sale in the United States, Dr. Wurtman incorporated Defendant, Interneuron.

79.    In or about 1990, Servier sub-licensed the rights to market, promote, distribute, detail, sell or otherwise profit from the sale of dexfenfluramine in the United States back to Interneuron.

80.    On or about February 27, 1990, representatives from Interneuron, Wyeth Defendants and Servier convened to discuss "certain situations pertaining to Pondimin", including protocols and respective responsibilities relating to adverse event reporting and safety

26

information, during which Servier representatives Madame Derome-Tremblay and Christine Bazantay advised the Wyeth Defendants that there was a need to update the 1972 labeling for Pondimin. However, there was no change in the labeling of Pondimin between 1990 and mid-1996.

81.    In September of 1990, Servier, co-licensor of both Pondimin and Redux in coordination with Interneuron and the Wyeth Defendants, completed a study regarding the effects of fenfluramine isomers on Fisher Rats which showed significant levels of focal fibrosis in the hearts of rats treated with doses of dexfenfluramine as compared with hearts of untreated rats. Defendants knew or should have known of the Fisher Rat study and how those articles related to fenfluramine and dexfenfluramine. At the very least, Interneuron and the Wyeth Defendants knew or should have known of the results of the Fisher Rat study by March 19, 1992, the date that the study was released by Servier.

82.    On March 18, 1991, Interneuron, filed a petition with the DEA requesting that fenfluramine and its isomer dexfenfluramine be removed from Schedule IV and all other controls of the Controlled Substances Act (CSA) such that, among other things, both Pondimin and Redux could be dispensed and prescribed in larger quantities and over longer incremental dosage durations. Interneuron's efforts to gain the de-scheduling of both fenfluramine and dexfenfluramine, continued by using politicians and large anti-regulatory political action committees aimed at persuading both the DEA and FDA.

83.    On or about October 25, 1991, Interneuron, through the assistance of Cato Research, Ltd. filed an Investigational New Drug Application with the FDA in furtherance of securing approval for Redux.

27

84.    In 1992, Dr. Weintraub again published a series of articles sponsored, subsidized, and/or supported by the Wyeth Defendants in Clinical Pharmacological Therapies, in which he reported his research regarding the long term use of fenfluramine and phentermine for weight control. Dr. Weintraub's research assumed the safety of fenfluramine, and did not examine the short-term or long-term safety of the drug. The Wyeth Defendants failed to conduct or fund any studies or research regarding the long-term safety of the fenfluramine. The Wyeth Defendants, and later Interneuron, through their sales representative force, promoted Dr. Weintraub's conclusion that long term combination use of fenfluramine and phentermine was effective for the management of obesity to both physicians. and the public. As a result, sales of Pondimin began to increase dramatically.

85.    On or about November 19, 1992, Interneuron entered into a joint venture or partnership with American Cyanamid, a predecessor company to the Wyeth Defendants, and Servier pursuant to the terms of a "Patent and Know-How Sublicense Supply Agreement" for the manufacturing, marketing, labeling, promotion and sale of Redux.

86.    On or about April 15, 1993, Interneuron and Wyeth Defendants, through their employees, agents and/or representative parties, including Dr. Bobby W. Sandage, Jr., Interneuron's Vice-President of Research and Development and employees Dukart, Hammershaimb, Gantt, Lefkowitz, Stout and Quinn of Wyeth Defendants, met with Dr. Stuart Rich, Section of Cardiology at University of Illinois at Chicago, an expert in the area of pulmonary hypertension ("PH"), to discuss the cases of PH reported following the use of Redux and "to help put this information into perspective." Interneuron and Wyeth Defendants at this time recognized Dr. Rich as a Principal Investigator and member of the steering committee for

28

the NIH Registry for the Characterization of PH who had reviewed approximately thirty-six (36) cases of the drug relationship between Redux and PH and further admitted that there was an association between PH and the intake of certain exogenous substances such as and including Redux. Dr. Rich advised Interneuron and Wyeth Defendants that there was an increased risk for PH which necessitated caution until more definitive information was available. This information placed or should have placed the Defendants on notice of the association between the Diet Drugs and pulmonary hypertension, and that pulmonary hypertension may be related to valvular heart disease.

87.    By 1993, the Wyeth Defendants labeling for Pondimin indicated that there were only 4 reported cases of pulmonary hypertension reported in association with the drug. Yet. that same year, Dr. Francois Brenot published an article related to the association of Fenfluramine and pulmonary hypertension, in the British Heart Journal. Dr. Brenot identified 25 cases of pulmonary hypertension associated with the use of fenfluramine and/or dexfenfluramine. The Wyeth Defendants knew or should have known of the Brenot article. The Wyeth Defendants should have known by at least 1993 that Pondimin was defective and unreasonably dangerous and further that its Pondimin labeling was false.

88.    On or about May 21, 1993, Interneuron filed its NDA with the FDA for the approval of Redux. In its bid for FDA's Redux approval, Interneuron and Wyeth Defendants relied upon several pivotal "studies" in its NDA, including but not limited to, the Noble Study, the Van Itallie Study, and the Index Study.

89.    Interneuron and Wyeth Defendants knew at the time of submitted the NDA for Redux to the FDA that these pivotal studies where flawed, defective and substandard. thereby

29

effecting misrepresentations to the FDA, the medical community, Plaintiffs' prescribing physicians and Plaintiffs. In particular, Interneuron and Wyeth Defendants were on notice through advice by Interneuron's own auditor, Bruce Sturgeon (such internal audits being typically required and expected of NDA applicants), both before and during the NDA submission and subsequent supportive documentation, that:

a.   the Noble Study had careless record keeping, several protocol violations, a lack of documentation for final disposition of the drug and missing progress reports to the IRB;

b.   the Van Itallie Study, which Mr. Sturgeon concluded would probably not be accepted by the FDA – though Interneuron still included the same in its NDA — included a protocol change increasing the allowable weight fluctuation from 3 kilograms to 7.5 percent of body weight without notifying the IRB or FDA, thereby reflecting a gross deviation from good clinical practices; used three patients who did not meet the revised criteria for the study; and contained inaccurate drug accountability for all patients, exacerbated by the fact that the drug was a controlled substance; and

c.   the Index Study was poorly monitored, lacked proper and complete documentation, contained high error incidents in key data reporting found across all sites, and suffered from poor data quality consistent among all sampled sites which could be extrapolated to all sites in the Index Study.

90.   During the time Interneuron filed its NDA for Redux, Interneuron and Wyeth Defendants knew or should have known that there were serious health risks associated with Redux which were neither sufficiently nor adequately expressed in either its NDA or its 120 Day Update.

91.   By 1993, nearly two decades after the 1977 Finnish study, numerous medical reports and studies had been published within mainstream medical journals and publications firmly establishing the same causal connection between high concentrations of free circulating serotonin, as caused by fenfluramine and dexfenfluramine, and heart valve lesions, including but not limited to: Ann Redfield MM, Nicholson WJ, Edwards WD, Tajik AJ. *Valve disease*

30

*associated with ergot alkaloid use: echocardiographic and pathologic correlations.* Ann Intern
Med 1992;117:50-52; and Pellikka PA, Tajik AJ, Khandheria BK, et al. *Carcinoid heart
disease: clinical and echocardiographic spectrum in 74 patients.* Circulation 1993;87:1188-96.
As reaffirmed by these medical journal publications and their long and numerous progeny
spanning nearly three decades, there was an available body of scientific knowledge identifying
the pharmacologic affects of various anorexic agents, including fenfluramine and
dexfenfluramine, on circulating (release, reuptake inhibition and monoamine oxidase inhibition)
serotonin. Moreover, there was an available body of scientific knowledge relating elevations in
serotonin as found in ergotamine toxicity and carcinoid syndrome, like fenfluramine and
dexfenfluramine, to incidents of VHD. During this period of time in which Interneuron and the
Wyeth Defendants were proceeding with the Redux NDA and while the Wyeth Defendants
continued to sell Pondimin on the United States market, Interneuron and Wyeth Defendants
knew or should have known that fenfluramine and dexfenfluramine caused an increase in
circulating serotonin and that a serotonin-related mechanism was directly associated with VHD.
Interneuron and Wyeth Defendants failed to disclose the connection between the Diet Drugs and
VHD and/or failed to perform pre-marketing studies and post-marketing surveillance which
would have detected this fact.

92.     In or about 1994, cases of heart valve damage from the use of the Diet Drugs
began to appear throughout the Country including sonographer, Pamela Ruff's discovery in
Fargo, North Dakota of VHD in patients who had ingested Pondimin. Numerous cases of Diet
Drug induced VHD prompted physicians at the Mayo Clinic to undertake a case review which
ultimately resulted in the untimely forced withdrawal of the Diet Drugs from the market.

31